T.C. Memo. 2007-238


UNITED STATES TAX COURT


LEE F. HANEY, SR. AND JEAN C. HANEY, a.k.a. JEANIE HANEY,
Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 9459-06.                    Filed August 20, 2007.


Kevin D. Watley and B. David Sisson, for petitioners.

Ann L. Darnold, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge: Respondent determined deficiencies and penalties with regard to petitioners' Federal income tax as follows:

| Year | Deficiency | Penalty I.R.C. Sec. 6663 |
|------|-----------|--------------------------|
| 2000 | $106,074 | $79,555.50 |
| 2001 | 74,841 | 56,130.75 |
| 2002 | 74,156 | 55,617.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are:

(1) Whether petitioner's solely owned S corporation received and failed to report taxable income for taxable years 2000, 2001, and 2002;

(2) whether petitioners are entitled to reductions in their Federal taxable income for 2000 attributable to additional Employee Embezzlement Account deductions that were not claimed on their return;

(3) whether various deductions claimed as business expenses of petitioner's solely owned corporation should be disallowed as personal expenses of petitioners or for failure to substantiate;

(4) whether petitioners are entitled to disallowed deductions relating to their racing activities; and

(5) whether petitioners are liable for the fraud penalty pursuant to section 6663 for the years in issue or, in the alternative, whether petitioners are liable for the accuracy-related penalty pursuant to section 6662.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated into our findings by this reference. Petitioners are married and resided in Oklahoma at the time that they filed their petition.

Petitioner Lee F. Haney, Sr. (petitioner), is the sole shareholder of Flair Enterprises, Inc. (Flair Enterprises or the company), an S corporation. Flair Enterprises operates three full-service automobile paint and body shops doing business as Flair Body Works in the Oklahoma City metropolitan area. The Flair Body Works shops are managed by petitioners' sons, Phillip Haney and Alan Haney.

During the years in issue, it was the business practice of Flair Enterprises to keep complete and accurate records of work performed by Flair Body Works for their insurance customers. Flair Body Works is a preferred provider for several major automobile insurance companies, which requires strict records to be maintained by service providers seeking payment on claims. During the years in issue, Flair Enterprises maintained two separate sets of books for Flair Body Works. One set of books recorded transactions that were covered by the automobile insurance companies; the other recorded transactions with noninsurance customers and other regular payors.

Checks from customers with insurance were deposited and recorded through a computerized accounting system; checks from noninsurance customers and other payors were simply recorded and totaled on a legal pad bearing the title "Do Not Touch" and on bank deposit slips and then cashed, not deposited, by petitioner Jean C. Haney (Mrs. Haney). During the years in issue, Mrs. Haney regularly endorsed and cashed checks for Flair Enterprises, d.b.a. Flair Body Works. Mrs. Haney continued to cash company checks until approximately late 2001, when petitioners' bank no longer permitted her to cash company checks.

In addition to checks from noninsurance customers, many checks received by Flair Enterprises and cashed by Mrs. Haney in 2000 and 2001 were from COPART Salvage Auto Auctions (COPART), which is in the business of purchasing wrecked vehicles from body shops for sale to junk dealers. COPART has been picking up vehicles from Flair Body Works for more than 20 years.

Many of the checks cashed by Mrs. Haney were received by Flair Enterprises from Hudiburg Chevrolet. Flair Enterprises leased pickup trucks from Hudiburg Chevrolet during the years in issue. The lease payments were deducted as business expenses of the company. Flair Enterprises also purchased approximately $300,000 in auto parts annually from Hudiburg Chevrolet in the years in issue. In appreciation for the volume of business that Flair Enterprises did with it, Hudiburg Chevrolet reimbursed the

company for lease expenses in monthly checks ranging from approximately $1,200 to $1,700. Most of the Hudiburg Chevrolet checks were cashed by Mrs. Haney, and the income from them was not reported by Flair Enterprises.

Many of the checks cashed by Mrs. Haney were received from B&H Supply Co. (B&H), Flair Body Works' paint vendor. The B&H checks will be described in detail below.

When Mrs. Haney returned from cashing the checks at the bank, she delivered the cash received from the Hudiburg Chevrolet lease reimbursements and certain B&H payments to petitioner. She then divided the remainder of the cash among herself and petitioners' two sons.

On March 28, 2000, a check in the amount of $580.62 was deposited in petitioners' personal checking account. The deposit slip for this deposit included the notation "Flair" next to the amount of the check. During 2002, $39,000 in cash was also deposited into petitioners' personal checking account.

With a couple of minor adjustments, Flair Enterprises's bank deposits for the years in issue roughly totaled its reported income for those years. Any checks that were cashed instead of deposited were not included in the income of Flair Enterprises.

Agreement With B&H

Prior to and during the years in issue, B&H sold paint to Flair Enterprises for use at its Flair Body Works body shop

locations.  Flair Enterprises is one of B&H's largest customers. In 1999, Flair Enterprises was purchasing PPG paint products for use in its body shops.  PPG canceled its business with B&H, and Flair Enterprises was asked by B&H to switch to Dupont paint products.

Flair Enterprises entered into an agreement (the supply agreement) with B&H for the purchase of Dupont paint products instead of PPG products for 5 years, for which change in supply Flair Enterprises would be compensated $150,000.  Dupont financed the supply agreement as an incentive for Flair Enterprises to continue using B&H as its paint vendor and to switch to Dupont paint products.  Half of the incentive payment was to be paid at the time of the contract formation in 1999, and the remaining half was to be paid in monthly installments of $1,250.

Although the supply agreement does not address the issue, B&H intended that Flair Enterprises would use the incentive payment to purchase shop equipment, such as paint booths or spraying machines, and referred to the supply agreement as a "shop investment".  Flair Enterprises received a payment of $75,000 in 1999, which year is not before us, when the supply agreement was executed, and received 60 monthly installments of $1,250.  The monthly installments of $1,250 received throughout 2000 and until September 2001 were not invested in the business of Flair Enterprises but were cashed by Mrs. Haney.

In addition to the incentive payments, exhibit A to the supply agreement between Flair Enterprises and B&H committed B&H to provide Flair Enterprises with Dupont products at 25 percent off the suggested shop price and 3M products at 35 percent off. Although most of B&H's customers receive their discounts as reductions from their invoiced costs, Flair Enterprises requested that it be issued monthly rebate checks instead. The amounts allocated to each Flair Body Works location were reflected on the checks.

At the direction of Phillip Haney, the rebate checks from B&H were made payable to Flair Racing, Inc. (Flair Racing), another operation solely owned by petitioner discussed infra, instead of to Flair Enterprises. The rebate checks were then deposited into Flair Racing's bank account. There is no reference to Flair Racing in the supply agreement between B&H and Flair Enterprises. Flair Racing does not purchase any paint products from B&H. The amounts paid pursuant to the supply agreement were unrelated to any racing activities in which petitioners or their family engaged and would have been paid regardless of petitioners' involvement in racing. The supply agreement was not a racing sponsorship by B&H or Dupont.

Embezzlement by Karen Steelman

Karen Steelman (Steelman) began her employment with Flair Enterprises as bookkeeper and accountant in 1996 and was trained in office procedures by Phillip Haney and Mrs. Haney. The practice of separating noninsurance checks and cashing them instead of depositing them was established before Steelman joined the company, although no records were kept of such transactions at the time she began her employment. Steelman was fired in November 2000 when it was discovered that she was embezzling substantial funds from Flair Enterprises during the course of her employment. Phillip Haney's wife, Regina Haney (Gina Haney), had been assisting Steelman with the bookkeeping for Flair Enterprises from May 1999 through November 2000. When Steelman's employment was terminated in November 2000, Gina Haney became the primary bookkeeper.

Respondent allowed petitioners a deduction of $86,950 in calculating their taxable income for 2000 for money embezzled by Steelman in that year. The embezzlement deduction was labeled as Employee Embezzlement Account in the "other deductions" section of the Form 1120-S, U.S. Income Tax Return for an S Corporation, filed by Flair Enterprises for the year 2000.

In November 2000, petitioner employed attorney/certified public accountant Jeffrey C. Trent (Trent) to investigate misappropriation and embezzlement of corporate funds. Trent

identified specifics of the suspected wrongdoing, and Steelman was fired after Trent's report to petitioner. Trent was then engaged to perform records reconstruction and to assist petitioners in preparation of their income tax returns for the years in issue. Trent also assisted law enforcement, including the Federal Bureau of Investigation, with the criminal investigation of Steelman.

During an audit interview, Trent, representing petitioners, told the examining agent that Steelman embezzled funds three ways: Additional weekly payroll checks that Steelman tricked Mrs. Haney into signing by showing her a check stub payable to one entity and then making the check itself payable to a different person, credits posted to Steelman's personal credit card account from Flair Enterprises' credit card machine, and a pension and profit sharing plan benefiting Steelman that she created without authorization and enhanced using company assets for her own benefit. Trent also represented to the examining agent that Flair Enterprises kept no cash on hand and that there was no petty cash fund set up at the company.

Steelman utilized several means to embezzle funds from Flair Enterprises, including writing additional unauthorized payroll checks to herself and depositing unauthorized funds from the company into a section 401(k) account in her name. However, Steelman did not embezzle cash funds from the company.

Representations Made During Audit

During audit, the examining agent conducted several interviews of petitioners, Trent, and other related parties. Regarding the practice of cashing checks, Trent, informed by petitioners, represented in several interviews that all income of Flair Enterprises was deposited during the years in issue. Mrs. Haney represented that she did not cash any checks after Steelman left in November 2000. Regarding the existence of a petty cash fund at Flair Enterprises, Trent represented that the company had no petty cash fund and that none was reflected on the company's books.

Regarding the B&H supply agreement, Gina Haney, through Trent, told the examining agent that there was no written agreement between Flair Enterprises and B&H. One of B&H's representatives stated that B&H does not sponsor racers and that the monthly payments from B&H to Flair Enterprises did not amount to a racing sponsorship, although petitioners may have wanted to characterize them in that manner.

Flair Racing, Inc.

Petitioner formed Flair Racing in order to limit the liability of petitioners and Flair Enterprises related to certain Legends race cars owned by petitioner. Legends race cars are 5/8-scale replicas of 1930s and 1940s sedans.

Racing is a hobby for petitioner and his sons, and they have been involved with cars and racing for more than 30 years. They have enjoyed participating in races and attending races as spectators. They have enjoyed their association with celebrities and race car drivers, and photographs of petitioners' family members with several celebrity athletes and entertainers are displayed at the Flair Body Works locations. Petitioners' grandchildren enjoy riding in the Legends race cars.

Petitioner took his Legends race cars to a celebrity Legends car race at the Texas Motor Speedway in 1997 or 1998, but he did not participate in any races during the years in issue. In 1997 or 1998, petitioner and his sons raced 50 of 52 weekends. The races petitioner entered took place all over the State of Oklahoma and in several other States. A good purse for winning a race ranges between $300 and $500. It cost petitioner approximately $5,000 to enter his four cars in the Texas Motor Speedway race. Petitioner never made a profit from his racing activities, nor did he intend to.

Flair Enterprises advertises and promotes its Flair Body Works business through the use of the Legends race cars displaying the name and quality of paint jobs provided to customers of Flair Body Works. Examples of the promotional use include celebrity associations and demonstrations of the Legends race cars; however, the only promotional use of the Legends race

cars during the years in issue was their display at the Flair Body Works locations.

Most of Flair Body Works' customers come from insurance agents who send their clients to the shops. Most of the customers live in the Oklahoma City area and were not present in large numbers at car races outside of the Oklahoma City area. Petitioner has worked on race cars for other people occasionally, but he typically does not charge to perform that work.

Petitioner maintained a race shop originally located at Flair Body Works' Moore, Oklahoma, location. The race shop and the Legends race cars were used in Flair Body Works' business to demonstrate for customers how various car parts worked. In October 2000, petitioners acquired 80 acres of land in their names personally. A $20,000 escrow deposit, a $60,000 downpayment, and another $20,000 payment made at closing were all paid by Flair Racing in cash. Petitioners built their personal residence on the acquired land, as well as a new race shop, which was not completed as late as July 2003. In October 2001, petitioners gave to each of their two sons 5 acres of the 80-acre parcel.

The new race shop was not open to the public, and there were signs saying "Stay Out" by the gates at the entrances to petitioners' property. Petitioner did not want people around the Legends race cars or the race shop. The race shop was not air-

conditioned during the years in issue, and there was no bathroom in the shop because it was near petitioners' residence. Following completion of the race shop, it housed the Legends race cars owned by Flair Racing, trailers used to haul the Legends race cars, petitioners' personal motor home used by petitioners' family when they traveled to races, an old pickup truck owned by one of petitioner's friends, as well as petitioners' personal lawnmower. In 2002, petitioners acquired an additional parcel of land adjacent to the 80-acre tract for the purpose of building a test track for his Legends race cars. The test track was completed shortly before trial of this case in January 2007.

Flair Racing did not have any employees during the years in issue and did not pay petitioner a salary. Petitioner made all decisions about what expenses were paid from the Flair Racing bank account, and only petitioners had signature authority on that bank account. The mortgage payments on petitioners' 80-acre tract, which included improvements such as petitioners' personal residence and the race shop, were paid automatically from Flair Racing's bank account monthly. The mortgage payments were posted on Flair Racing's books as "notes payable", except one payment in November 2000 that was posted to a "loan from shareholder" account. The purchase of the 80-acre tract was entered on Flair Racing's depreciation schedules in the amount of $80,000. In September 2000, $13,625 was paid from Flair Racing's bank account

to purchase pipe for fencing that surrounded the entire 80-acre parcel. The cost of the fencing pipe was capitalized and placed on Flair Racing's depreciation schedules. Various other deductions were claimed by Flair Racing for repair work performed on the Legends race cars, insurance premiums on each of the Legends race cars, and other expenses during the years in issue.

Depreciation and Other Expenses Claimed by Flair Enterprises

During the years in issue, petitioners made substantial improvements to their land, including cleaning and repairing erosion from the preexisting pond located on the tract, preparing the land for construction of three homes for petitioners and their two sons, installing driveways on the land, and constructing the race shop. In 2000, Flair Enterprises purchased heavy construction equipment totaling approximately $142,420 and including bulldozers, dump trucks, track hoes, road graders, and brush hog mowers. All of these items were depreciated by Flair Enterprises. Flair Enterprises also claimed a $20,000 section 179 deduction for the taxable year 2000 related to the acquisition of a tractor and loader. The construction equipment acquired in 2000 was purchased in anticipation of petitioners' purchase of the 80-acre tract and was used almost exclusively on the tract, where it was also stored. Prior to 2000, the only heavy equipment used at Flair Body Works locations included a

dump truck, a flatbed, and an old wrecker.  This equipment was primarily used to move vehicles and to haul scrap items.

In 2001, Flair Enterprises spent approximately $180,000 for additional equipment, shop buildings, and improvements to the 80-acre tract.  Expenses were also incurred and paid by Flair Enterprises for house plans and preliminary plumbing and inspection work for the sites where the race shop and homes of petitioners and their two sons were to be built.  The assets acquired by Flair Enterprises in 2001 included two entryway signs for the 80-acre tract, a second brush hog mower, a lawnmower, and various other pieces of equipment.  For a total cost of $81,315.74, two buildings were also purchased by Flair Enterprises that year and placed on the tract for use as petitioner's race shop.  Flair Enterprises also made substantial expenditures in 2001 for cleanup of a preexisting oil well site on the 80-acre tract, fencing, drainage, construction of entry signs and of the race shop building, and other improvements to the land.

In 2002, the year that petitioners moved into their new house on the 80-acre tract, Flair Enterprises deducted on its tax return $226,477.10 of costs classified as improvements, the majority of which relate to improvements to the 80-acre parcel of land and construction of the personal residences of petitioners and their two sons.  The substantiation information provided for

these expenses consistently references the personal residences of petitioners and their two sons.  Also included in the list of Flair Enterprises' expenditures for 2002 are numerous checks payable to petitioners' sons to reimburse them for expenses related to their homes.  Additional expenses in 2002 related to the improvement of the 80-acre tract and the construction of the personal residences of petitioners' family were deducted as repair expenses by Flair Enterprises.  The utility costs for petitioners' home were deducted by the company as well.  Flair Enterprises purchased a Harley Davidson motorcycle at a cost of $19,000 in 2002 and added the motorcycle to its depreciation schedule.  Repairs to the motorcycle that year were deducted by Flair Enterprises as business promotion expenses.

During the years in issue, Flair Body Works had an American Express charge account that was used by several members of petitioners' family, and the statements were broken down by the family member making the respective charges.  The American Express card was used for personal travel and meals, including several trips to Las Vegas, Nevada.  The use of the American Express card increased about the time that the check cashing practice of petitioners stopped.  Although substantiation for these expenses was requested by the Internal Revenue Service (IRS) during the audit of Flair Enterprises, no documentation was provided by petitioners for most of the expenditures.

In 2001, Flair Enterprises purchased gocarts costing $2,160.70 and deducted the cost under miscellaneous expenses. The gocarts were bought with company funds by petitioner as toys for his grandchildren. Also in 2001, a storm shelter was purchased for $5,670 by Flair Enterprises and deducted as an office supplies expense of the company. The storm shelter is located at petitioners' personal residence inside their garage; nothing related to the Flair Body Works business is stored in the shelter. During the years in issue, numerous dry cleaning bills were paid by Flair Enterprises for petitioners and their family members. Department store and gift shop purchases were also reimbursed as business expenses of the company, for which no substantiation of business purpose has been provided.

No substantiation of deductibility has been provided for numerous company checks made payable to petitioners' sons. For example, no explanation has been provided for reimbursements to Phillip Haney by Flair Enterprises for dog food and a tee ball glove, which were deducted as shop supply expenses. During the years in issue, Flair Enterprises deducted loan payments made on Mrs. Haney's Mercedes and Gina Haney's Suburban vehicles. One $3,325.32 check to Mercedes Benz of OKC was categorized on the company's books as a "Materials" expense. Flair Enterprises deducted numerous payments related to petitioners' grandchildren's school and extracurricular activities. In 2000,

three company checks were labeled as "grandkid cheer team". Many similar expenses were recorded in the company's records as advertising expenses.

During the years in issue, petitioners owned a Winnebago that was used by their family when they traveled to car races. The insurance on the Winnebago was paid by Flair Enterprises and deducted as a business expense.

Petitioners owned land on Lake Texoma in Marshall County, Texas, during the years in issue. The land and mobile home located on the land are titled in the names of petitioners personally. Utility records for the Lake Texoma property reflect petitioner as the property owner of record. During the years in issue, Flair Enterprises deducted utilities, taxes, and insurance expenses related to petitioners' Lake Texoma property. Petitioners originally made payments on the trailer from their personal account, but at some point started making payments out of the Flair Enterprises account so that they could be written off as business expenses. Petitioners also personally owned a boat and trailer that were kept on the Lake Texoma property. The insurance on the boat and trailer was in petitioner's name but was paid by Flair Enterprises and deducted as a business expense of the company. Insurance on petitioners' personal water craft was also paid and deducted by Flair Enterprises for the years in issue.

OPINION

As a general rule, with respect to the amount of the deficiency in issue, the taxpayer bears the burden of proof. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir. 1975), affg. T.C. Memo. 1972-133. That burden may shift to respondent if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's tax liability. Sec. 7491(a)(1). However, section 7491(a)(1) applies with respect to an issue only if the taxpayer has complied with the requirements under the Code to substantiate any item, has maintained all records required by the Code, and has cooperated with reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews. Sec. 7491(a)(2)(A) and (B). For the reasons discussed below, petitioners' evidence is unreliable, and their claims are unsubstantiated. They have not satisfied the conditions for shifting the burden of proof to respondent. As discussed below, however, respondent has the burden of proving fraud by clear and convincing evidence.

Unreported Taxable Income

Gross income is defined in section 61 as all income from whatever source derived, including, but not limited to, income derived from business. Sec. 61(a). Generally, in determining

the tax of a shareholder of an S corporation for the shareholder's taxable year, the shareholder's pro rata share of the corporation's items of income, loss, deduction, or credit must be taken into account. Sec. 1366. As the sole shareholder of Flair Enterprises, the adjustments to the company's ordinary income would flow through to petitioner and be included on petitioner's individual income tax returns for the years in issue. The evidence establishes that petitioner's solely owned S corporation received and failed to report taxable income for the years in issue.

During the years in issue, Mrs. Haney regularly cashed checks from noninsurance customers and checks received from COPART, B&H, and Hudiburg Chevrolet. Office procedures at Flair Enterprises required that two sets of books be maintained. Cashed checks were listed in a handwritten notebook, but not posted to the company's computer system. Checks from insurance customers were deposited in Flair Enterprises' bank account, not cashed, and were recorded in the company's computer system. Only deposited checks were included as income on the tax returns of Flair Enterprises for the years in issue. Several of petitioners' family members participated in this dual record-keeping process, by which petitioners were able to avoid reporting substantial amounts of income received by the company.

Included among those checks cashed by Mrs. Haney were checks from COPART, which were reimbursements for towing, storage, and expenses incurred with regard to vehicles that were eventually declared totaled by insurance companies and hauled away from Flair Body Works. These costs reimbursed by COPART had already been included in those deducted by Flair Enterprises on its Forms 1120-S for the years in issue. Because Flair Enterprises failed to take the COPART reimbursements into account either as reductions in its claimed business expense deductions or as taxable income, it underreported its net income in the years in issue by the total amount of COPART checks cashed by Mrs. Haney in those years.

Also included in the checks cashed by Mrs. Haney during the years in issue were lease reimbursement checks from Hudiburg Chevrolet in appreciation for the high volume of business that Flair Enterprises did with the car dealership. The monthly lease payments made by Flair Enterprises to Hudiburg Chevrolet were deducted as business expenses of the company, but the lease reimbursements from Hudiburg Chevrolet back to Flair Enterprises were not included in the income of the company to offset the previously taken lease expense deductions. Rather than being deposited into Flair Enterprises' bank account and included in income, the Hudiburg Chevrolet reimbursement checks were cashed by Mrs. Haney and turned over to petitioner.

Flair Enterprises also received two checks monthly from B&H during the years in issue in accordance with a 1999 supply contract between the company and B&H. One monthly payment by B&H to Flair Enterprises was an incentive payment of $1,250 in return for a 5-year commitment of Flair Body Works to continue to purchase paint products from B&H. The B&H checks were cashed throughout 2000 and through September 2001, when petitioners' bank no longer allowed petitioners to cash checks. Throughout the remainder of 2001 and all of 2002, the incentive payments from B&H were deposited into the bank account of Flair Racing and were not recognized as income to Flair Enterprises, which was contractually entitled to the payments. None of the B&H incentive payments that were cashed were recognized in the income of any entity or individual. The B&H incentive payments that were deposited into the Flair Racing bank account were included in the income of Flair Racing.

The other monthly check from B&H to Flair Enterprises was a rebate check for an agreed percentage of the invoiced cost of Dupont and 3M products purchased from B&H. The rebate checks varied in amount each month and were based on the volume of products purchased by Flair Body Works during the previous month. Although the agreed percentage discount from B&H was guaranteed to Flair Enterprises and the rebate was a remittance of that discount to Flair Body Works, the B&H rebate checks were made

payable to Flair Racing, at the direction of petitioner's son, Phillip, and were deposited monthly into Flair Racing's bank account. The B&H rebate checks are properly income to Flair Enterprises, which was contractually entitled to the discount rebates.

Petitioners allege that Mrs. Haney gave all cash received from the cashed checks to Steelman, who allegedly kept it as a large petty cash fund. Petitioners assert that new vendors frequently would come by the Flair Body Works locations with very expensive parts and needed to be paid immediately. Because Steelman was not authorized to sign checks for Flair Enterprises, she allegedly needed the large petty cash fund to make these purchases. Petitioners rely on Steelman's confessed embezzlement activities to explain the missing cash from the cashed checks, alleging that Steelman must have stolen the cash if it is missing.

Petitioners' testimony is implausible. Petitioners offered no corroborating evidence that Steelman was engaged in buying parts for the body shop business. Petitioners have not presented any records of cash purchases allegedly made by Steelman or any other cash expenditures by the company. Trent told the examining agent that there was no petty cash fund, and Gina Haney testified that none existed after Steelman was fired and that all cash from checks cashed by Mrs. Haney after Steelman's termination went to

petitioners. Regarding the allegations that Steelman embezzled the cash from the checks regularly cashed by Mrs. Haney, although the embezzlement investigation and ensuing case against Steelman was extensive, petitioners did not claim in any court proceeding or police report prior to this case that Steelman stole cash from Flair Body Works. Steelman embezzled funds from Flair Enterprises through misuse of checks payable to her and through unauthorized contributions to a 401(k) plan, but we do not believe that she embezzled cash from the company.

Rather, the evidence establishes that substantial amounts of cash received by Mrs. Haney from the checks cashed at petitioners' bank were retained by Mrs. Haney and distributed to petitioner and their two sons. Furthermore, petitioners admit and the evidence establishes that substantial amounts of cash were kept in petitioners' personal safe at home and in a safe-deposit box at their bank.

In addition to determining that the cashed checks were additional income to Flair Enterprises, and thus to petitioners, respondent determined that cash deposits into petitioners' personal checking account totaling $39,000 in 2002 constituted additional unreported income to petitioners that year. Petitioners argue that these cash deposits were taken from the sum of cash received from cashing the above-mentioned checks and, thus, that respondent is double counting this sum as income to

petitioners. This argument is inconsistent with petitioners' assertion that the cash received from the cashed checks was not retained by petitioners but was entrusted to Steelman for an alleged petty cash fund. Because no records were maintained regarding the amount, timing, or source of cash that petitioner added to his personal safe, and because petitioners' testimony regarding the cash transactions was inconsistent and unpersuasive, petitioners have not met their burden of proving that respondent erred in including these cash deposits as additional income to petitioners in the notice of deficiency for 2002.

## Additional Employee Embezzlement Account Deduction

Petitioners assert that they are entitled to an increased deduction for cash funds allegedly embezzled by Steelman in 2000, before her embezzlement scheme was discovered. For the reasons stated above, we do not believe that Steelman had access to the cash that Mrs. Haney received upon cashing the checks received by Flair Enterprises. Petitioners are not entitled to a deduction for their Employee Embezzlement Account beyond what respondent has already allowed.

## Claimed Deductions Disallowed

Respondent disallowed many flowthrough deductions claimed by petitioners because they related to personal expenses of

petitioners and their family or because petitioners failed to provide the required substantiation.

Petitioners argue that respondent has refused to recognize the separate existence of Flair Racing as a business entity. Petitioners point out that both Flair Enterprises and Flair Racing are S corporations, and all income and deductions flow through to petitioners. However, respondent's disallowance of the disputed deductions is founded upon the determination that Flair Racing was not actively conducting business operations during the years in issue and upon general tax law principles defining the limits of deductible business expenses.

The parties agree that Flair Racing was incorporated to shield petitioners and Flair Enterprises from liability associated with the Legends race cars. However, petitioners presented no evidence of any business activities in which Flair Racing engaged during the years in issue. Petitioner testified that the Legends race cars were an enjoyable hobby for himself and his sons. No racing activities occurred during the years in issue, and the Legends race cars were not publicly displayed anywhere outside of the Flair Body Works locations. We are not convinced that Flair Racing was carrying on business during the years in issue.

Funds deposited in Flair Racing's bank account and included as income on Flair Racing's Federal income tax returns consisted

almost exclusively of rebate and incentive payments from B&H and lease reimbursements from Hudiburg Chevrolet that properly belonged to Flair Enterprises.  No payments were made from Flair Enterprises to Flair Racing for advertising or marketing services.  Flair Racing performed no services, engaged in no sales during the years in issue, and earned no income in those years.

Petitioners argue that the B&H payments to Flair Racing, which B&H owed to Flair Enterprises under the terms of their supply contract, were racing sponsorships and were properly allocated to Flair Racing.  Inconsistent testimony of petitioner and B&H's representatives regarding this issue was presented at trial.  One of B&H's representatives denied to the auditing agent that the payments were for a sponsorship.  It appears that he succumbed to pressure from his sales manager and his customer, Flair Enterprises, because he later testified at trial that the payments to Flair Racing did amount to a racing sponsorship. Another B&H representative testified that B&H would not permit petitioner to display B&H decals on their vehicles because B&H could not afford to sponsor their many customers' other race cars.  Thus, B&H received no advertising or marketing benefits from its alleged sponsorship of the Legends race cars, which benefits are the essence of sponsorship.  See Gill v. Commissioner, T.C. Memo. 1994-92, affd. without published opinion

76 F.3d 378 (6th Cir. 1996). Furthermore, the evidence establishes that B&H would have made the required monthly payments regardless of petitioner's racing activities.

All expense deductions claimed by Flair Racing for the years in issue were either nondeductible personal expenses of petitioners and their family or business expenses of Flair Enterprises. Petitioners claimed deductions on Flair Racing's returns for improvements to land where petitioners and their two sons built their personal residences, the purchase and repair of a Harley Davidson motorcycle, and depreciation and repair expenses incurred with respect to the Legends race cars and trailer. Additionally, petitioners deducted on Flair Racing's tax returns the interest paid on their residential mortgage secured by the 80-acre tract of land.

Because we have concluded that Flair Racing was not conducting business during the years in issue, it is not entitled to any business expense deductions related to any alleged racing or advertising activities. We are convinced that petitioners reported income as paid to Flair Racing in order to disguise the personal nature of expenses related to the Legends race cars and the 80-acre tract of land on which the personal residences of petitioners and their two sons sit. Petitioners' inclusion of the mortgage interest deduction related to their personal residence and surrounding land on Flair Racing's tax returns is

further indication of petitioners' attempts to portray falsely Flair Racing as an active business operation.

Petitioners claimed depreciation deductions for several pieces of heavy construction equipment acquired during the years in issue. However, petitioners have not presented any evidence of the business purpose of most of these items. Petitioners have presented some evidence with regard to a tractor and loader purchase to substantiate a $20,000 section 179 deduction claimed in 2000 by the company. Respondent maintains that the tractor was purchased as a personal asset for use on petitioners' 80-acre tract. Petitioners maintain that the tractor and loader were used to remove ice and snow from the Flair Body Works locations and to move wrecked vehicles. Petitioner testified, however, that the equipment acquired in 2000 was purchased in anticipation of buying the 80-acre tract, and it was stored at the tract, not at the business locations. He also testified that he thought the equipment was being depreciated on the schedules for Flair Racing. We conclude that petitioners have failed to establish that the tractor is a business asset, and Flair Enterprises is not entitled to a section 179 deduction for the purchase of the tractor in 2000.

Petitioners have not contested, and have thus conceded, respondent's disallowance of deductions from Flair Enterprises' income for various personal expenses of petitioners or for

unsubstantiated expenses.  We sustain the disallowance of these claimed deductions as determined by respondent.

Fraud Penalty

The penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Sadler v. Commissioner, 113 T.C. 99, 102 (1999).  Respondent has the burden of proving, by clear and convincing evidence, an underpayment for the years in issue and that some part of the underpayment for those years is due to fraud.  Sec. 7454(a); Rule 142(b).  If respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent penalty, unless the taxpayer establishes that some part of the underpayment is not attributable to fraud.  Sec. 6663(b). Respondent must show that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes.  Katz v. Commissioner, 90 T.C. 1130, 1143 (1988).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992).  Fraud will never be presumed.  Id.; Beaver v. Commissioner, 55 T.C. 85,

92 (1970). Fraud may, however, be proved by circumstantial evidence and inferences drawn from the facts because direct proof of a taxpayer's intent is rarely available. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including the consistent understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealing assets, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Dealing in cash is also considered a "badge of fraud" by the courts because it is indicative of a taxpayer's attempt to avoid scrutiny of his finances. See id. at 308. Additional "badges of fraud" include keeping a double set of books and handling one's affairs to avoid making the records usually made in transactions of the kind. Spies v. United States, 317 U.S. 492, 499 (1943). Evidence of fraud also includes a taxpayer's use of a business entity to cloak the personal nature of expenses. See Romer v. Commissioner, T.C. Memo. 2001-168.

For the reasons stated above, respondent's burden regarding the underpayment of tax in support of the fraud penalty has been met. Petitioners' consistent failure to report taxable income

and their improper deductions of personal expenses on the company's accounts during the years in issue resulted in substantial underpayments of tax for those years.

The evidence in this case also establishes the existence of several "badges of fraud" in petitioners' personal and business transactions. Petitioners consistently failed to report taxable income during the years in issue, most notably from checks that were cashed by Mrs. Haney and never recorded in the company's official books. Petitioner's solely owned corporation established and followed a policy of keeping complete and accurate computerized records for insurance transactions that would certainly be reported to the IRS by the insurance companies, but kept only a handwritten list on a notepad of other checks to the company and did not include the cashed checks as income to the company during the years in issue. The practice of keeping a double set of books in this fashion indicates petitioners' fraudulent intent to evade tax liabilities with regard to the income from checks that were cashed.

Petitioners' practice of consistently charging personal items to business expense accounts of Flair Enterprises and Flair Racing is additional evidence of fraudulent intent with regard to their income tax liabilities. Personal expenses of petitioners that were charged as business expenses include the downpayment and closing costs of petitioners' purchase of the 80-acre tract

on which they built their personal residence and the homes of their two sons. Substantial expenses related to the improvement of the 80-acre tract and the construction of the three residences on site were charged to business accounts. Petitioner testified at trial that he paid all the costs of his home and related improvements out of Flair Enterprises' account. Additional personal expenses deducted from business accounts include dry cleaning bills, lease payments for personal vehicles, insurance premiums on a personal water craft and on a Winnebago, utilities and taxes at petitioners' lake house, and several personal family vacations.

Additional evidence of fraud in this case consists of inconsistent and implausible explanations of behavior by petitioners and members of their family that were involved with their business. For instance, Trent stated during the audit, as informed by petitioner, that no checks were being cashed during the years in issue and all income was deposited into the company's account. Mrs. Haney stated during the audit that no checks were cashed after Steelman was fired in November 2000. These statements are contradicted by bank records. The evidence establishes and petitioners admit that Mrs. Haney regularly cashed certain checks payable to Flair Enterprises through September 2001, and handwritten records regarding such transactions were maintained substantially by Gina Haney.

Furthermore, Mrs. Haney testified extensively at trial about her regular practice of cashing checks for Flair Enterprises, asserting that she was the only person who handled cashing company checks. Mrs. Haney testified that Steelman's name was not on the Flair Enterprises account, and thus Steelman could not cash checks on the account, because petitioners were concerned about the possibility of embezzlement in general. Mrs. Haney claimed, however, that Steelman required that she cash the checks and turn over the currency obtained from the bank back to Steelman on every occasion. Her testimony is inconsistent, implausible, and not credible.

Gina Haney, who was the sole accountant and bookkeeper for Flair Enterprises after Steelman was fired in November 2000, represented during the audit that Flair Body Works did not receive any money from COPART and that there was no written agreement between Flair Enterprises and B&H. The evidence establishes that payments were received regularly from both COPART and B&H and that the majority of those payments were regularly converted to cash.

During the extensive criminal investigation of Steelman's embezzlement, no allegation was made by petitioners that Steelman embezzled cash from Flair Enterprises. Trent, on behalf of petitioners, represented during the audit that the company had no petty cash fund. Petitioners did not mention the existence of a

company petty cash fund during the embezzlement investigation, but now allege, as discussed earlier, that Steelman maintained a petty cash fund, into which all the cash from the cashed checks was placed, and that Steelman took that money with her when she left. Petitioners developed this argument only when faced with substantial income tax deficiencies related to the unreported income represented by the cashed checks. The belated, inconsistent, and implausible representations made by petitioners are evidence of petitioners' fraudulent intent.

Mrs. Haney regularly cashed checks from noninsurance customers and business associates but deposited checks from insurance customers. We are convinced that this pattern was a deliberate scheme to report only the income that was easily traceable because of reporting requirements applicable to the payors. We conclude that petitioners' statements and testimony regarding the cash transactions and the cash kept on hand by them personally were false. Petitioners' last-minute claims that all cash received by Mrs. Haney at the bank was given to Steelman, who then stole it, is particularly unconvincing. To the contrary, we believe that petitioners have fabricated this argument as a defense to their own wrongdoing in underreporting income and overstating deductions.

The evidence in this case establishing the fraudulent intent of each petitioner with regard to their understatements of

taxable income for the years in issue is clear and convincing. Petitioners have not proven that any part of the underpayments in dispute was not attributable to fraud.  See sec. 6663(b).  Upon consideration of the entire record, we conclude that petitioners are liable for the fraud penalty determined by respondent under section 6663(a).

We have considered the arguments of the parties that were not specifically addressed in this opinion.  Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing,

Decision will be entered

under Rule 155.